**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | |
|---|---|
| **ERIC O'KEEFE, and**<br>**WISCONSIN CLUB FOR GROWTH,**<br>  **INC.,**<br><br>        **Plaintiffs,**<br>  **v.**<br><br>**FRANCIS SCHMITZ, in his official and**<br>  **personal capacities,**<br>**JOHN CHISHOLM, in his official and**<br>  **personal capacities,**<br>**BRUCE LANDGRAF, in his official and**<br>  **personal capacities,**<br>**DAVID ROBLES, in his official and**<br>  **personal capacities,**<br>**DEAN NICKEL, in his official and personal**<br>  **capacities, and**<br>**GREGORY PETERSON, in his official**<br>  **capacity,**<br><br>        **Defendants.** | Civil Case No. _____<br><br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Now Come the above-named plaintiffs, Eric O'Keefe ("O'Keefe") and Wisconsin Club

for Growth, Inc., ("WCFG") (collectively, "Plaintiffs"), by and through their attorneys, and make

their Complaint against Defendants Francis Schmitz ("Schmitz"), John Chisholm ("Chisholm"),

Bruce Landgraf ("Landgraf"), David Robles ("Robles"), and Dean Nickel ("Nickel"), in their

respective official and personal capacities (collectively, "Defendants"), and against Gregory

Peterson ("Peterson"), in his official capacity only.[1] This action arises under the First and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871 (42 U.S.C. § 1983), and the doctrine recognized in *Ex Parte Young*, 209 U.S. 123 (1908). Plaintiffs allege and state as follows:

## NATURE OF THE ACTION

1. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

---

[1] The defined term "Defendants," as used in this Complaint, does not include Gregory Peterson, who is named only in the official capacity of his office and is referred to separately in allegations involving the official capacity of his office.

2. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

3.     These extraordinary circumstances call for extraordinary action from the federal judiciary. Federal courts, including the United States Supreme Court, have affirmed the principle that "investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals" and that "[i]t is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas . . . ." *Sweezy v. New Hampshire by Wyman*, 354 U.S. 234, 245 (1957). The Court should reaffirm these principles and issue preliminary and permanent injunctions ending the investigation and award damages to O'Keefe and WCFG in an amount to be determined at trial.

**JURISDICTION AND VENUE**

4.     This action arises under the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the doctrine recognized in *Ex Parte Young*, 209 U.S. 123 (1908). Jurisdiction of the Court is conferred by 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

5.     The United States District Court for the Eastern District of Wisconsin is a proper federal venue for this action because all the defendants are residents of Wisconsin pursuant to 28

U.S.C. § 1391(b)(1). In addition, pursuant to Section 1391(b)(2), a substantial part of the events or omissions giving rise to the claim occurred in Milwaukee County. Venue in the Milwaukee Division is appropriate because the events in question have their "greatest nexus" to the counties in that division. *See In re General Order Regarding Assignment of Cases to the United States District Judge Designated to Hold Court in Green Bay, Wisconsin* (E.D. Wis. Jan. 1, 2005).

## PARTIES

6.     Plaintiff Eric O'Keefe is an individual who resides at his permanent address in Iowa County, Wisconsin. O'Keefe is a veteran volunteer political activist with local and national activities, and he engages in First Amendment-protected political speech and associational activities in Wisconsin and nationwide, including through several independent organizations. O'Keefe is a director of WCFG. ██████████████████████████████

7.     Plaintiff WCFG is a 501(c)(4) social welfare organization that promotes free-market ideas and policies. It does this through public communications and its expressive associations with other groups promoting conservative policies. All of its public communications constitute "issue" advocacy—that is, none expressly urge the election or defeat of any candidate for office—and WCFG only associates and donates money to other groups that similarly engage in issue advocacy.

8.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████ Defendants' investigation, ██████████

4

██████████████ violates Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

9. On information and belief, Defendant Francis Schmitz is an individual who resides at his permanent address in Waukesha County, Wisconsin. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ At all times material to this Complaint, Schmitz was and is acting under color of law.

10. On information and belief, Defendant John Chisholm is an individual who resides at his permanent address in Milwaukee County, Wisconsin, and is the District Attorney of that county. In Wisconsin, District Attorney is a partisan position, and Chisholm ran for his post as a Democratic Party candidate and has strong ties with members of that Party in Milwaukee, including with Mayor Tom Barrett, who ran for governor twice against Scott Walker. At all times material to this Complaint, Chisholm was and is acting under color of law.

11. On information and belief, Defendant Bruce Landgraf is an individual who resides at his permanent address in Milwaukee County, Wisconsin, and is employed as an Assistant District Attorney in the Milwaukee County Attorney's Office. On information and belief, Landgraf prosecutes cases for that Office's Public Integrity Unit ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ At all times material to this Complaint, Landgraf was and is acting under color of law.

12.     On information and belief, David Robles is an individual who resides at his permanent address in Milwaukee County and is employed as an Assistant District Attorney in the Milwaukee County Attorney's Office. As a member of that Office's Public Integrity Unit,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████     At all times material to this Complaint, Robles was and is acting under color of law.

13.     On information and belief, Dean Nickel is an individual who resides at his permanent address in Dane County, Wisconsin. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████     Defendant Dean Nickel worked under Peggy Lautenschlager, the former Attorney General of Wisconsin from 2003 to 2007 and member of the Democratic Party, as head of the Wisconsin Department of Justice Public Integrity Unit and did not remain in that high-level position after her tenure ended. At all times material to this Complaint, Nickel was and is acting under color of law.

14.     On information and belief, Gregory Peterson is an individual who resides at his permanent address in Eau Claire County, Wisconsin, and is a retired Appeals Court Judge. Peterson has been appointed as John Doe "Judge" and is responsible for administering the most recent John Doe proceeding in this investigation. ████████████████████████████

████████████████     Peterson is a Defendant in this matter in his official capacity only, and Plaintiffs are not seeking money damages from him. An injunction against Peterson is necessary

to provide Plaintiffs adequate relief in this lawsuit. █████████████████████ At all times material to this Complaint, Peterson was and is acting under color of law.

**FACTS**

## I.    Background

15.    The investigation at issue in this Complaint is taking place against the backdrop of the most tumultuous political events in Wisconsin in generations—perhaps in history.

16.    On November 2, 2010, candidates of the Republican Party won control of all branches of the Wisconsin government for the first time since 1998.

17.    Contributing to this success was the growing influence of conservative independent social welfare organizations. ███████████████████████████████████ ████████████████████. These social welfare organizations published political speech, in media, including television and radio, on issues related to their organizational purposes. Around the time of the 2010 Wisconsin gubernatorial race, independent interest groups spent, according to the best estimates, a combined $37.4 million, largely for communications criticizing positions taken by the candidates.

18.    Many with left-leaning views have opposed the involvement of independent interest groups like WCFG in election speech. This opposition escalated considerably after the Supreme Court decided *Citizens United v. Federal Election Commission*, 558 U.S. 310, in January 2010, which struck down regulations barring corporations from making independent express advocacy expenditures in elections as violative of the First Amendment. The Court explained that the "right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it," and that the "First Amendment has its fullest and most urgent application to speech uttered

7

during a campaign for political office." 558 U.S. at 339 (internal quotation marks omitted). Demonstrating the consternation surrounding that decision among many affiliated with the Democratic Party, the President of the United States chastised members of the Supreme Court in attendance at that year's State of the Union Address over the decision. This tactic was unprecedented, as observers noted at the time.

19. Around this time, left-leaning advocates began to theorize and propose that campaign finance theories such as "coordination" could be redefined and diverted from their traditional scope to undermine *Citizens United* and offer an alternative route to preventing independent organizations from participating in elections. Another campaign finance concept recommended for redefinition was the distinction between "issue" advocacy and "express" advocacy. Left-leaning advocates have also spent considerable time and efforts theorizing of ways to expose the names of donors to social welfare organizations in order to allow them to become the targets of reprisals. This has led to scandals including those in the federal government, as IRS agents have been accused of illegally leaking the names of Republican and conservative donors around the 2012 presidential election.

20. In March 2010, in the wake of *Citizens United*, GAB adopted new rules expanding the meaning of "express" advocacy to include forms of political speech that had long been considered "issue" advocacy. Plaintiff O'Keefe, WCFG, and a liberal organization called One Wisconsin Now sued in the United States District Court for the Western District of Wisconsin to block these rules, and several other lawsuits were filed, including in state court. Within days, upon the advice of the Wisconsin Department of Justice, GAB agreed to a settlement, recognizing that it had overstepped its legitimate authority and violated the First Amendment. The settlement process became complicated when the court determined that

8

prudential doctrines, such as *Pullman* abstention, should prevent the settlement from being finalized, but GAB adopted an emergency rule and has stated that it will not enforce the March 2010 rules. ████████████████████████████████████████████████████

████████

21.     At the same time, the left wing of the political spectrum has continued to build up a substantial independent expenditure machinery in Wisconsin and nationwide, which rivals and, in fact, surpasses the competing conservative groups like WCFG. By the 2011 and 2012 recall races at issue in this case, these left-leaning organizations were able to outraise and outspend conservative groups in most of the relevant campaigns, and this system has allowed union money to flow freely to support Democratic Party candidates and causes in these recall elections.

22.     Until his election as Governor in 2010, Scott Walker was the County Executive of Milwaukee County. On April 24, 2009, Walker declared his candidacy for Governor of Wisconsin.

### A.     Walker Proposes, and the Legislature Passes, the Budget Repair Bill Against Unusually Heated Opposition

23.     During his 2010 campaign, Walker emphasized the need to reduce taxes and the size of the Wisconsin government to stimulate a dismal state economy. He criticized the 2009-2011 state budget as being too large given the economic situation and pledged to diminish it if elected. On September 14, 2010, Walker won the Republican primary, and he was elected Governor on November 2, 2010. He took the oath of office on January 3, 2011.

24.     By early February, Walker's new administration had projected a budget shortfall in 2013 of $3.6 billion and also determined that a budget repair bill to resolve a $137 million shortfall for the year ending June 30, 2011, was necessary. Among the critical problems

identified in the state budget were costs related to public employees' pensions and health care plans. Much of the cost was the result of contracts with public sector unions.

25.     The Walker administration proposed a bill ("Budget Repair Bill") to remove the ability of public sector unions to bargain collectively over pensions and health care. The bill also proposed to limit pay raises to the rate of inflation.

26.     The response to this proposal was immediate and aggressive. Thousands of protestors demonstrated in and around the capitol building in Madison.

27.     The events gained extensive press coverage, and images of the demonstrations were broadcast in homes nationwide. Advocacy groups across the political spectrum recognized this controversy as an opportunity to participate in a public debate about the proper role of unions generally, the proper role of public sector unions in particular, and the proper role of government. The airwaves in Wisconsin became flooded with advertisements for and against Walker's budget plan, and money came from across Wisconsin and the nation. For the budget battle alone—which involved no elections—opponents of the Walker budget spent an estimated $1.8 million and supporters spent $1.7 million. ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████

28.     For many opponents, Walker's plan was more than a political debate and quickly became personal and vindictive. For example, the website DemocraticUnderground.com maintained a list of contributors to Scott Walker for the purpose of boycotting their businesses and otherwise harming them economically. On March 3, police discovered 41 rounds of 22-caliber rifle ammunition outside the Wisconsin state capitol, and ammunition was also discovered inside a city and county government building in downtown Madison. Protestors

10

convened at Scott Walker's private residence in eastern Wisconsin, where his family was residing, and also targeted private residences of legislators at various times.

29.     Around this time, a liberal blogger posing as David Koch called Scott Walker to entice him into making statements suggesting coordination of publicity efforts. On March 7, the Democratic Party of Wisconsin seized on this opportunity to file a complaint with GAB, alleging campaign coordination despite there being no legal basis for the complaint.

30.     Around February 17, Senate Minority Leader Mark Miller led fourteen Senate Democrats—in fact, every Democratic Party-affiliated member in that body—in absconding from Wisconsin. Their whereabouts were unknown for days before they were discovered to be hiding in Illinois. The purpose of their effort was to prevent the twenty-member quorum necessary under Wisconsin law to pass spending measures and thereby stall Walker's budget plan.

31.     On February 25, following sixty hours of debate, the Wisconsin Assembly, which had the requisite quorum, passed Walker's Budget Repair Bill.

32.     The Bill was sent to the Senate, which still lacked the quorum necessary to pass a spending bill. The Republicans thus stripped the spending provisions from the Bill and passed the remaining measures, which included the measures related to collective bargaining. Protests engulfed the capitol once again.

33.     On March 10, the Assembly passed the Senate version.

34.     On March 11, Scott Walker signed the Bill, which became 2011 Wisconsin Act 10.

**B.      Political Hostilities Escalate Further After the Budget Repair Bill's Passage**

35.      The passage of the Budget Repair Bill turned out to be only the beginning of a political war in Wisconsin, as opponents continued to stretch the bounds of legality and civility in their campaign to defeat the Act and, later, Scott Walker.

36.      Legal challenges to the Bill came early and often. On March 11, the day it was signed, Dane County Executive Kathleen Falk filed a lawsuit against the state, arguing that it was unconstitutionally passed. Dane County District Attorney Ismael Ozanne filed a similar lawsuit on March 16.

37.      Wisconsin's Secretary of State, Doug La Follette of the Democratic Party, refused to publish the Budget Repair Bill, to try to thwart its becoming law. The Legislative Reference Bureau was thus forced to bypass the Secretary of State's office and officially published the law on March 25.

38.      On March 25, AFL-CIO Laborers Local 236 and Firefighters Local 311 filed a lawsuit, and on June 15, 2011, all public unions in Wisconsin joined to file a lawsuit in federal court alleging violations of Equal Protection and the First Amendment.

39.      On March 18, 2011, Dane County Judge Maryann Sumi granted a temporary restraining order against the Budget Repair Bill. Subsequently, the Wisconsin Supreme Court reversed this decision, finding that it violated separation of powers and Wisconsin precedent.

40.      Lawsuits, however, were not the only tactic tried. Wisconsin State Employees Union, AFSCME Council 24, began circulating letters to businesses in southeast Wisconsin, demanding that they support "workers' rights" by placing a sign in their windows: "Failure to do so will leave us no choice but [to] do a public boycott of your business. And sorry, neutral means 'no' to those who would work for the largest employer in the area and are union members."

12

Similar threats occurred across the state. Among the many businesses targeted for boycotts were some that took no position on the Walker budget.

41.     On April 1, 2011, a woman from Cross Plains was charged with two felonies for threatening to kill fifteen Republican state senators who voted for the Budget Repair Bill. She emailed them that opponents of the legislation were planning "to assault you by arriving at your house and putting a nice little bullet in your head." By this time, the Republican caucus in the legislature had received at least a dozen credible specific death threats.

42.     Demonstrations continued as before the Budget Repair Bill's passage. We Are Wisconsin ("WAA") a prominent left-wing social welfare organization that rivaled or surpassed WCFG in spending at all relevant times, sponsored demonstrations in home communities of Republican senators. Protestors began living in tents around the capitol in a complex they called "Walkerville." When the Wisconsin State Assembly met to pass the 2012 fiscal year budget, an onlooker screaming "you're F-A-S-C-I-S-T!" had to be physically apprehended. Other onlookers chained themselves to the railing.

43.     Political tensions reached the highest offices in Wisconsin, demonstrating that no institution was immune from partisan feeling. On June 27, Supreme Court Justice Ann Walsh Bradley filed a complaint claiming that fellow Justice David Prosser had placed her in a chokehold several weeks before. Other justices claimed that Bradley was the aggressor. These events occurred as the Court was ruling on the legality of the Budget Repair Bill. The event spawned two investigations, neither of which resulted in charges.

**C.      The Result of Political Hostilities Is Unprecedented Recall Elections**

44.     Legislative recall campaigns were commenced for every member of the Wisconsin Senate who was legally eligible for a recall at the time, some being commenced even

13

before the Budget Repair Bill's passage. Republican Senators were targeted for their support of the Budget Repair Bill. Democratic Senators were targeted for their opposition of the Budget Repair Bill, including their departure from the state to thwart legitimate democratic process. These efforts resulted in actual recall elections for nine Senators. The scope of this recall effort exceeded any precedent in United States history. The elections were held on July 19, August 9, and August 16.

45.    Advertisements engulfed the Wisconsin airwaves around the time of the recall elections and the Supreme Court race. Total independent spending around the time of the state Supreme Court race was estimated to exceed $4.5 million, with WCFG being a top spending organization around the time of the primary in that race. Around the time of the 2011 Senate recall elections, the best estimates show that total spending reached a record $44 million, with $34.6 million being spent by independent advocacy groups. According to Wisconsin Democracy Campaign, Left-leaning WAW led independent groups in spending, followed by WCFG, left-leaning Greater Wisconsin Committee and Citizens for a Strong America.

46.    Democrats held all their seats in the recall races, and Republicans lost two of six seats but retained control of the Senate.

47.    On November 15, 2011, the Walker recall effort commenced. On November 19, the Committee to Recall Scott Walker organized an event that was advertised as being "in coordination with We Are Wisconsin, United Wisconsin, and the [Democratic Party of Wisconsin]." Organizers hoped to obtain 600,000 to 700,000 signatures on the recall petition, which would, under Wisconsin law, trigger a recall election.

48.    Once again, the turn of events resulted in a deluge of political advertisements from groups and official campaigns trying to influence the public narrative. Both liberal and

14

conservative organizations participated, raising money from individuals, corporations, and unions. Unions were especially important contributors, contributing millions through activist groups such as WAW. It was typical on both sides for groups to donate to like-minded groups. It was also typical for personnel to be shared between groups and donors, especially unions. For example, Marty Beil, a board member of WAW was also the Executive Director of the Wisconsin State Employees Union, the Wisconsin Chapter of AFSCME. Kristen Krowell, the Executive Director of WAW was also a founding director of Wisconsin Progress, which has ties to Planned Parenthood, Fair Wisconsin, and Wisconsin Progress PAC. Phil Neuenfedlt, treasurer of WAW, was also President of Wisconsin State AFL-CIO. Under Wisconsin law, contribution limitations do not apply during the signature-gathering phase of a recall election, and GAB issued a ruling confirming this principle also applied to the Walker recall effort.

49.     In March 2012, GAB announced that more than 900,000 valid signatures had been collected to recall Governor Walker. On March 30, GAB voted in favor of a recall election over Walker campaign objections that possibly hundreds of the signatures were invalid.

50.     Also on March 30, Milwaukee Mayor Tom Barrett announced that he would again run against Scott Walker in the governor's race. This began a primary election cycle that Barrett won on May 8, and in connection with which unions made record expenditures.

51.     The recall election between Walker and Barrett occurred on June 5, 2012, and Walker won by a greater margin than he defeated Barrett in 2010. Also on June 5, lieutenant governor Keefisch won her recall election, as did two incumbent Senators. One Republican won an open seat race on this day as well. One Republican Senator was narrowly recalled, resulting in a temporary swing of power in that body in favor of the Democratic Party. But in the November

15

2012 general election, Republicans gained two Senate seats, reclaiming control. And Republicans retained the 60-39 edge in the Assembly earned in the 2010 Republican sweep.

52.    According to Wisconsin Democracy Campaign of independent spending surrounding the 2012 recall election shows that a record $81 million was spent around the time of these elections. Independent groups spent $36.5 million.

53.    Walker and Republican lawmakers had thus been victorious, not only the in budget battle, but also in the recall race. However, efforts to attack them politically continued.

## II.    The "John Doe" Investigation

54.    Of the many efforts to attack Governor Walker tried by his opponents, none proved so persistent as the investigation conducted continuously for nearly four years by the Milwaukee County District Attorney's office under the guidance of John Chisholm, Bruce Landgraf, and David Robles. Begun on pretextual grounds in 2010, the investigation grew into an ongoing audit of the Walker campaigns, allowing prosecutors an inside track to scrutinize actions of Walker staffers as they were taken, despite that they were unrelated to the original purported purpose of the investigation. It also allowed the Milwaukee District Attorney's office to influence public opinion through leaks of selective information meant to embarrass Walker and his campaign. The investigation became a rallying cry for Democratic Party members and candidates and a central issue in the Walker recall right up until the election.

55.    ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

16

**The Milwaukee County Attorney's Office, Which Has Initiated and Conducted the Investigation, Is Biased Against Walker and the Budget Repair Bill**

56.    The investigation originated in the Milwaukee County Attorney's Office (sometimes, "the Office" or the "DA's Office") ███████████████████████████████ ███████████████████████████████.

57.    The leader of the Office was at all relevant times and is District Attorney John Chisholm, who won that seat as a Democratic Party candidate and has been supported by unions in previous campaigns, including in the most recent race to hold his DA position, during which he received support from, among others, the AFL-CIO. Chisholm also is a donor to Democratic Party candidates and, as of April 2012, had given $2,200 exclusively to Democratic and liberal candidates, making him one of the top donors in the Milwaukee County Attorney's Office.

58.    Altogether, as of April 2012, employees in Chisholm's office had donated to Democratic over Republican candidates by roughly a 4 to 1 ratio.

59.    During the 2011-2012 campaign to recall Scott Walker, at least 43 (and possibly as many as 70) employees within Chisholm's office signed the recall petition, including at least one Deputy District Attorney, 19 Assistant District Attorneys, and members of the District Attorney's Public Integrity Unit.

60.    Chisholm has close ties with Democratic Party members around Wisconsin and in Milwaukee, including Mayor Tom Barrett. In 2008, just days before Democrat Tom Barrett ran for reelection as Mayor of Milwaukee, Chisholm appeared in a two-and-a-half minute clip that began and ended with the official Barrett-for-Mayor reelection screen. In the clip, Chisholm praised Barrett's record on crime, education, and city development. Upon information and belief, Chisholm provided other forms of support for Barrett and received similar support both publicly and privately in their respective campaigns.

17

61.     Like many public sector employment divisions, assistant district attorneys in Wisconsin are represented by a union, which was affected by the passage of the Budget Repair Bill in much the same way as the other public sector unions. Thus, assistant district attorneys, like many other public sector employees had a direct, personal stake in the debates over the Budget Repair Bill. Among other things, the Budget Repair Bill resulted in their having to contribute more to their health care and pension plans, resulting in a direct financial loss to them from the Bill. Unlike many public sector unions, which have had a difficult time recertifying after the Budget Repair Bill went into effect, the assistant district attorneys union recertified again in November 2013.

**B.     The Investigation Began on Pretextual Grounds and Had a Political Motive From the Beginning**

62.     Under Wis. Stat. § 968.26, a prosecutor may commence a special investigation, commonly known as a "John Doe" investigation, by filing a complaint with a judge and alleging that there is reason to believe that a crime has been committed. The judge in this matter, often called a "John Doe judge," does not act on behalf of the court but serves essentially as a grand jury of one. Once a district attorney requests a judge to convene a John Doe proceeding, the judge *must* convene the proceeding and *must* issue subpoenas and *must* examine *any* witnesses the district attorney identifies. This gives a district attorney extraordinary ability to obtain subpoena power over private parties as part of an investigation.

63.     Wisconsin law also allows a judge to impose a secrecy order over witnesses in a John Doe proceeding. In this respect, a John Doe proceeding differs from normal practice before a federal grand jury, where a secrecy order binds jurors and prosecutors but typically not witnesses. According to common practice in John Doe proceedings, prosecutors who ask for

18

secrecy orders almost inevitably receive them. ████████████████████████████████
████████████████████████████

64.     The investigation has lasted nearly four years, with the first phase beginning on May 5, 2010, and ending on February 21, 2013. It was conducted by attorneys at the Milwaukee County Attorney's Office under the supervision of Defendant Chisholm. For purposes of opening the proceeding, the crime that the Milwaukee District Attorney's office purportedly had reason to believe was committed related to missing money from veteran's fund called Operation Freedom, which was founded by Scott Walker. But Operation Freedom was never a priority of the District Attorney's Office, which had grander plans in mind from the outset.

65.     After 2006, the Operation Freedom funds were managed by the Michelle Witmer Chapter of the Military Order of the Purple Heart ("MOPH"). In 2008, Darlene Wink, an employee in the Milwaukee County Executive's Office identified an apparent shortfall of roughly $11,000 from funds received by MOPH from the Executive's Office. The Executive's Office subsequently informed the Milwaukee County Attorney's Office.

66.     On April 23, 2009, Chief Investigator David Budde interviewed Thomas Nardelli, Chief of Staff to Milwaukee County Executive Scott Walker, regarding the missing funds. Nardelli told Budde that he believed that Kevin Kavanaugh, the MOPH chapter treasurer, was responsible for the discrepancy and likely had stolen over $11,000 from the funds.

67.     This interview occurred over one year before the Milwaukee County Attorney's Office opened a John Doe proceeding for the purported purpose of investigating the discrepancy.

68.     Upon information and belief, the Milwaukee County Attorney's Office decided to use a John Doe proceeding to investigate the Milwaukee County Executive's Office as a means of influencing the 2010 election in which Scott Walker was a candidate for Governor. Attorneys

19

within the Office determined that, by opening an investigation into the missing Operation Freedom funds, they could investigate Darlene Wink's activities on her county computer and possibly expand an investigation into Walker's employees more generally to identify possible violations of law that could be linked directly to Scott Walker.

69.     In the petition requesting the commencement of a John Doe proceeding, Defendant Landgraf represented that a John Doe proceeding was necessary because the Executive's Office had not provided documentation that would allow investigators to trace the funds from Milwaukee County to MOPH and because interviewing witnesses outside a John Doe proceeding had "not yielded satisfactory results." *See* Ex. A, Petition for Commencement of a John Doe Proceeding, *In re John Doe Proceeding* (Wis. Cir. Ct. Filed May 5, 2010). In fact, the County Executive's Office, after this representation became public, denied this allegation and stated in no uncertain terms that it had made "multiple follow-ups" to the DA's Office, since it had originally requested the investigation. Moreover, with one exception, every interview cited in the subsequent criminal complaint against Kavanaugh was with a willing witness outside the John Doe process.

70.     The purported line of inquiry cited by Defendant Landgraf was narrow: "to identify the origin of the funds transferred to the Order." *Id.* Yet, within half the time between the Nardelli interview in 2009 and the commencement of the John Doe proceeding in May 2010, the investigation had turned to other issues involving Walker, his campaign, and his staff. And within two years, the investigation had turned to Walker's gubernatorial administration in Madison and, within three years, it had become the basis for a state-wide probe into virtually every conservative independent organization involved in Wisconsin politics.

20

71.     Upon information and belief, even the purported line of inquiry had little if any importance to the Operation Freedom investigation. The concerns from the Executive's Office related to what happened to the funds *after* they had been transferred to MOPH and had little if any relevance to the "origin" of the funds, *id.*, which, upon information and belief, was never in doubt. Yet Landgraf used this pretext as an excuse for "subpoenaing county officials" and for "examination of business records maintained by the County Executive's office and other County Departments," despite that relatively few records would be relevant to and relatively few officials would have knowledge of this narrow topic. The actual purpose of the petition was to obtain access to county officials and documents for an open-ended fishing expedition into Walker's office.

72.     The political potential of the investigation was apparent to Landgraf from the beginning. In the petition, Landgraf argued that the investigation should be conducted under a secrecy order because "publicity of allegations and inferences would be particularly unfair to the County Executive, a man who is seeking the nomination of the Republican Party for the Office of Governor of the State of Wisconsin in this Election Year." *Id.* Under the purported basis for the John Doe proceeding, this would be unnecessary: an investigation that Walker's Chief of Staff invited would hardly embarrass Walker, so long as it was limited to its original purpose, and imposing a secrecy order could prevent Walker from demonstrating to the public that he was not the target and that his office had requested it—two arguments Walker had a difficult time making subsequently precisely because of the secrecy order. In fact, it was the secrecy order and the concomitant lack of public scrutiny that allowed Landgraf and others to turn the investigation against Walker, to permit selective leaks to embarrass Walker, and to prevent any substantive defense by Walker or others as the investigation became a media sensation during his recall.

Thus, upon information and belief, while requesting secrecy with the purported purpose of helping Walker avoid embarrassment, Defendant Landgraf made it all the more possible to embarrass him.

73. The first priority of the investigation was the county employees, and Darlene Wink in particular, and its aims were far broader than tracing a few thousand dollars to a source that was uncontested. Nine days after the commencement of the proceeding, the John Doe judge signed a search warrant allowing investigators to search the Milwaukee County computer that Wink used, and the warrant was executed immediately. Without delay, investigators examined her computer and had already discovered Wink's personal email accounts in time to issue a Preservation Letter Request the next day, May 15. Wink's personal email accounts bore no relation to the purpose of tracing funds from the County to MOPH. Nevertheless, the John Doe judge subsequently issued a search warrant for them. Wink, like so many witnesses with information about Operation Freedom, would later testify willingly about the Operation Freedom funds, demonstrating that, had their purpose been to ascertain what she knew of the funds, investigators could simply have asked. In contrast to the one-year delay to launch an investigation into the missing funds, the few days needed to target Wink shows that Walker's employees were of interest from the very beginning.

74. The same day as the search, the Milwaukee County Supervisor John F. Weishan, Jr., sent a criminal complaint to Defendant Chisholm, carbon copying Defendant Landgraf. The complaint alleged that Darlene Wink was "illegally using state resources for political purposes" by posting articles favorable to Scott Walker. This amounted to "donat[ing] resources, email services, computer services, staff salary, etc., which did not belong to her for the political benefit of Scott Walker's campaign." In addition, the complaint alleged that Scott Walker's campaign

failed to report these illegal contributions and, in so failing, violated Wisconsin law. The complaint concluded that the Milwaukee County Attorney's Office should investigate, not only Darlene Wink, but also Scott Walker and his campaign. Thus, within nine days of the commencement the investigation, Chisholm and Landgraf had succeeded in their true goal: finding an excuse to conduct an open-ended investigation of Walker's staff for the remainder of his campaign and beyond.

### C. The Scope of the Investigation Immediately Broadened and Has Broadened Exponentially Ever Since

75.     Chisholm, Landgraf, and their subordinates, including Defendant Nickel, followed through on that purpose. The investigation has been breathtakingly broad.



76.     On May 10, 2010, GAB formally initiated an investigation into William Gardner, a railroad owner, based on a complaint by his former girlfriend that he had asked her to make a campaign contribution to Scott Walker on his behalf and with his reimbursement. Under Wisconsin law, the venue for an eventual prosecution would have to be (and eventually was) Washington County because of Gardner's residency in Hartford. Nevertheless, that very month, GAB consulted with Landgraf and they agreed that this investigation should continue in Milwaukee County under the auspices of the John Doe investigation. The Gardner allegations were unrelated to the Operation Freedom funds, and there would be no basis for drawing a connection between the issues under investigation—unless it was already established that the

23

investigation was aimed at individuals or groups that support Walker, who was the sole common denominator. On information and belief, the purpose was to lend credibility to requests before the John Doe judge to expand the investigation further into Walker, his associates, his campaign, and his supporters.

77.     On May 28, 2010, Gardner contacted GAB, agreed to cooperate, and eventually turned over the information that would be used in the criminal complaint against him. A John Doe proceeding was unnecessary to obtain his conviction, but served as a pretext to allow Chisholm and Landgraf's continue their unlawful fishing expedition into Walker's affairs.

78.     The investigation quickly turned to other employees within Walker's office, including through computer seizures at county offices, and by November 1, 2010, investigators succeeded in obtaining a search warrant of another employee in the County Executive's Office: Kelly Rindfleisch.

79.     Continuing their pattern of using the John Doe investigation for political means, investigators executed a broad search warrant allowing them to comb through the Office of the County Executive the day before the November 2 gubernatorial election. That same day, investigators executed a search warrant at the home where Rindfleisch was residing on a temporary basis. Execution of this warrant was not necessary for the investigation, as Rindfleisch did not keep any possessions there except clothes and other personal items.

80.     By the end of November, prosecutors turned their investigation on Timothy Russell, another county employee, whose computer was seized in August. The John Doe Judge authorized expansion of the John Doe proceeding on November 30, and Milwaukee authorities promptly executed a search warrant on his home on December 7. Although this raid produced nothing of value for the John Doe investigation, it uncovered wholly unrelated conduct on behalf

of Russell's domestic partner that Chisholm and Landgraf used to further justify continued expansion of the investigation.

81.    Over the following year, as political tensions in Wisconsin blazed, investigators continued to dig deeper into the Walker affairs in an effort to find some evidence of criminal conduct that could influence the recall election. By December 2011, the investigation had expanded into alleged bid-rigging in connection with a competitive bidding process for office space for the Milwaukee County's Department of Aging. The bidding process occurred in the fall of 2010, as did the events under investigation, and the tip leading to the investigation was received in the fall 2010. By December 2011, investigators were asking whether Walker's office had improperly provided inside information to some brokers ahead of others during the bidding process. No bid was ever awarded, making the theory unlikely to succeed.

82.    As of May 2012, this line of inquiry was still ongoing, and, by this time, investigators were focused on whether a Walker aide had improperly received preferential treatment in the bidding process. This line of inquiry could not have been contemplated at the outset of the investigation because the events had not yet occurred. The events at issue were entirely unrelated to the Operation Freedom funds, and the sole common denominator with the other subject matters of the investigation was Scott Walker and his supporters.

83.    Upon information and belief, numerous other legal and factual avenues were also being explored and had been explored at this time, none leading to a viable prosecution against Walker or those close to him.

84.    By June 2012, finding no basis for prosecution related to the 2010 Department of Aging office bids after months of resources had been poured into the inquiry, the County Attorney's Office, rather than move on, continued to search for anything that could be used for

25

political purposes without any regard for probable cause or even reasonable suspicion. On June 18, 2012, Defendant Robles filed an open records request with the state Department of Administration seeking communications between the agency and staffers in Governor Walker's office at the state capitol. The request sought all communications "related to the designation and determination of individuals as 'key professional staff' of the Office of Governor" since the time Walker took office on January 3, 2011. Robles tried to disguise the purpose of the request. It was not submitted on Milwaukee County DA letterhead and did not provide Robles's job title. Robles provided a personal e-mail address for the request, raising issues under Wisconsin's public records laws, but the possible impropriety was never investigated. Legal counsel for the Department of Administration recognized that the request related to the official business of the County Attorney and emailed a response to Robles's government email account on June 27 with a carbon copy to Kent Lovern and Hanna Kolberg of the DA's Office.

85. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

86. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

87. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

88. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

89. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

27

90. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

91. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

92. ███████████████████████████████████████████

███████████████████████████████████████████████

28

93.

94.

**D.**

95.

96.

97.

98.

99.

100.

101.

102. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

103. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

104. ████████████████████████████████████████
████████████████████████████████████████████

105. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

106. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

107. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

**E.** ███████████████████████████████████████████

    108. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

    109. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

    110. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

    111. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

34

112. ████████████████████████████████████████

███████████████████████████████████████████
████████████

113. ████████████████████████████████████████
████████

**F.**     **The Investigation Has Been Characterized by Prosecutorial Misconduct**

114.     Along with allowing prosecutors' ongoing access to Walker-related files, the investigation provided an avenue for them to engage in intimidating behavior and harassment to achieve the goals of their politically motivated quest.

115.     One such incident began in September 2010, when Christopher Brekken, owner of Rice Lake Harley Davidson in Barron County, received a subpoena seeking the credit card number used for certain purchases from his dealership on a specific date. Brekken's dealership does not and did not maintain records of the credit card numbers of specific customers and had no way of obtaining the information. In fact, such information is protected by Wisconsin and federal law, and it would be illegal for Brekken's dealership to maintain records of credit card numbers or obtain them from other sources. Brekken timely informed Landgraf that he had no information in response to this request and could not obtain it. This answer did not satisfy Landgraf, and he obtained a bench warrant for Brekken's arrest. Brekken was arrested on October 19, 2010 and remained in jail even after producing the basic information about the purchases that he was legally allowed to maintain. Landgraf informed Brekken's attorney that he should pressure Brekken's bank or credit card company to turn over the information, despite that it would be illegal to do so. Brekken was finally released after he agreed to drive five hours to

35

Milwaukee to testify before the John Doe Judge, which resulted in his providing to Landgraf the same information that he had initially provided.

116. Brekken has subsequently sued Landgraf on several civil counts, including false imprisonment and abuse of process. In a hearing in that case in March 2013, Barron County Judge Timothy Doyle expressed his amazement at Landgraf's behavior: "Obviously a lot of what happened here was politically motivated and not—the conduct described is nothing that we as Wisconsinites should be proud of, bottom line . . . . Mr. Landgraf was behaving badly, probably for political reasons."

117. Landgraf expressed his own view of the affair in November 2013 to the Wisconsin Reporter: "What difference does it make? . . . We ultimately got the information and details we needed." Though clearly inconsistent with prosecutorial ethics, the statement accurately describes the philosophy and *modus operandi* of the investigation.

118. Another incident occurred in December 2011, when Landgraf ordered that Andrew Jenson, a commercial real estate broker, be arrested, and he was be jailed overnight. Jensen and his real estate firm were both donors to Walker's 2010 campaign. Defendant Robles personally undertook the task of arresting him. The incident caused a sensation in the Milwaukee papers, where Jensen's mug shot was prominently published, and it was broadcast that criminal charges were pending.. The papers also stated that Jensen was jailed for "refusing to cooperate" with the investigation. None of this was true. Over a year later, Jensen's attorney, with the consent and approval of the John Doe Judge, issued a short statement that his client was not a target of the investigation, that he would not be charged, and that he had "fully cooperated, and ha[d] truthfully answered all of the investigators' questions." Landgraf and Robles never explained their actions in light of the basis for jailing Jensen being proven false.

119.    The investigation also involved home raids against unsuspecting individuals that resulted in the discovery of no criminal conduct whatsoever. In all cases, these raids were unrelated to legitimate law enforcement purposes but were intended to intimidate and harass persons affiliated with the County Executive's office.

120.    At dawn on September 14, 2011, around a dozen law enforcement officers, including FBI agents, raided the home of former Walker aide Cynthia Archer in Madison. Dane County Sheriff Dave Mahoney told reporters that one of his deputies had been placed at the house during the search at the request of investigators from Chisholm's office and that his office was otherwise not involved. To this day, it is unknown what prosecutors were looking for or what they *thought* they were looking for, but the evidence seized has apparently not proven relevant to any of the crimes eventually charged. This, of course, did not prevent Archer's reputation from being harmed in the process as collateral damage of Defendants' search for materials to use against Walker.

121.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

122.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

37

123. █████████████████████████████████

124. █████████████████████████████████

125. █████████████████████████████████

126. █████████████████████████████████

127. █████████████████████████████████

128. █████████████████████████████████

129.

130.

131.

132. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

133. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

134. ███████████████████████████████████████

██████████████████████████

135. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

40

136.

137.

138.

139.

### E. The Targets of the Investigation Were Selected Based on Political Views and Associations

140. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

141.    In January of 2010, the City of Milwaukee awarded Jeff Fleming a no-bid contract paying $75 an hour for up to 15 hours a week with benefits. Through December 2009, Fleming had been a campaign spokesman for Mayor Tom Barrett, who was then a candidate against Walker for the 2010 governorship. His contract was to perform public relations services for a division of the Mayor's office. During his time in this role, Fleming went back and forth between county duties, private business work, and campaign work for Barrett. Among other things, Fleming worked on speeches for Barrett, and correspondence regarding this and other campaign activities was sent both to Fleming's city account and his personal account. Fleming was hired again in August 22 to be a part-time spokesman for the Department of City Development. Barrett's Chief of Staff explained that "We knew Jeff, and were comfortable with him," and news stories raised the concern that Fleming was working for the campaign on city time. The District Attorney's Office did not investigate this appearance of impropriety, much less commence an open-ended investigation into Barrett's campaign.

142.    In spring 2010, the Milwaukee County District Attorney's Office declined to prosecute a county employee named Christopher Liebenthal, who was caught engaging in "excessive political blogging" for liberals from his taxpayer-funded computer. The District Attorney's Office recognized that "Mr. Liebenthal's actions constitute an extreme example," but stated that it would prefer to see the situation handled as a personnel matter rather than a criminal

matter. The decision by Defendants Chisholm and Landgraf to treat this conduct as a personnel matter is completely different from how they treated indistinguishable conduct by Wink and Rindfleisch. Each was charged criminally on multiple counts, and Rindfleisch was sentenced to jail time for similar conduct treated as a "personnel" matter in Liebenthal's case.

143. In September 2010, the *Milwaukee Journal-Sentinel* reported that unions and Democratic candidates were coordinating a plan to attack Scott Walker for neglecting county facilities in connection with a parking garage incident. Unions would sponsor television ads, officials would continue to call for an independent investigation, and the Democratic governor's administration would allow state engineers to inspect the county facility. ████████████

████████████████████████████████████████████████

████████████████████████████████

144. On September 22, 2010, the Wisconsin Republican Party filed a formal complaint with GAB alleging illegal coordination based on comments by John-David Morgan, an SEIU Local # 1 employee who actively supported Barrett's campaign, to a Walker campaign member. Morgan boasted that unions were commanding local media coverage of the campaigns and that county supervisors—he mentioned at least one specific name—were involved as well. Both the Morgan incident and the ensuing Republican GAB complaint received coverage in the *Milwaukee Journal-Sentinel* and other news sources. ████████████████████

████████████████████████████████████████████████

██████████████████

145. In 2011, the Wisconsin Republican Party filed a complaint with GAB regarding Shelly Moore, a Democratic candidate for government and a public school teacher. The complaint alleged that she used school equipment, including her computer, for her recall

campaign. In a work email, published in news stories about the complaint, Moore acknowledged that she was prohibited from using public property for this purpose, but stated "I don't frankly care." This was reported widely in Wisconsin and around the nation. Defendants did not investigate this Moore's conduct. ██████████████████████████████████

██████████████████████████████

146.    In July 2011, weeks before the recall election between Democratic Party challenger Shelly Moore and Republican incumbent Sheila Harsdorf, reports surfaced that We Are Wisconsin offices were identified to be operating out of the same building offices as official Shelly Moore campaign offices in multiple sites. ███████████████████████████

████████████████████████████████████████████

█████████████████

147.    Also in summer of 2011, a complaint was filed with GAB against Friends of Senator Hansen, a Democratic incumbent, alleging coordination with liberal groups. The complaint states "Any person with eyes can see after reviewing the material sent to homes, or from watching TV advertisements sponsored by these various groups, that a direct violation of campaign law has occurred." ████████████████████████████████

████████████████████████████████████████████

████████████████

148.    On August 2, 2011, the Republican Party of Wisconsin filed a complaint with GAB asking for an investigation of "possible coordination" between representative Sandy Pasch and Citizen Action of Wisconsin, where Pasch serves on the board of directors. ████████████

████████████████████████████████████████████

█████████████████████████████████

44

149. On November 19, 2011, the Committee to Recall Scott Walker, a left-leaning political committee subject to the same requirements under Wisconsin law as Walker's official recall committee, including prohibitions on corporate contributions, announced a gathering to kick off the Walker recall effort. The event was widely announced as being "[i]n coordination with We Are Wisconsin, United Wisconsin, and the [Democratic Party of Wisconsin] . . . ." In fact, the Recall Committee was formed by leading Union and Democratic social welfare organization members, and the timing of the recall was carefully discussed between these members, political candidates, and nationwide Democratic Party leaders, including officials from the Barack Obama presidential campaign. In one prototypical meeting in October 2011, union leaders met with Obama's campaign manager and deputy campaign manager for several hours to discuss the timing of the recall. Social welfare organizations such as United Wisconsin had been collecting unofficial signatures since February 2011 in preparation for the recall. United Wisconsin registered a political action committee for the recall in March 2011. This activity was reported in November 2011 as raising questions about United Wisconsin's "independence." ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

150. On March 25, 2012, Daniel Bice of the Milwaukee Journal Sentinel reported that Wisconsin for Falk had come "almost out of nowhere" and "blitzed" local airwaves with $1.6 million of television advertisements to favor Kathleen Falk. The name of this supposedly independent group was suspiciously similar, noted the article, to Falk's official committee, "Falk for Wisconsin," and the candidate appeared in the advertisements, directly staring at the camera, clearly demonstrating that Falk worked with this group to film the ads. Other advertisements

45

produced by this supposedly independent organization include Falk voice-overs, again indicating her involvement in creating the advertisements. ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████

151.    In May 2012, Michael Dean, on behalf of Anthony Ostry, filed a formal complaint with GAB and with John Chisholm, alleging campaign violations by Wisconsin AFL-CIO. The union sent advertisements constituting express advocacy by mail and was apparently designed to fall within the "members only" disclosure exemption of Wis. Stat. § 11.21. In fact, the mailing was clearly deficient by that statute's guidelines, most obviously in that Ostry, who was not an AFL-CIO member, received the document. The complaint alleges that AFL-CIO must have known of these blatant deficiencies, indicating willful violation of the statute. No one from GAB or the Milwaukee County District Attorney's Office ever followed up with Ostry or Dean and no investigation occurred, must less a state-wide John Doe investigation concerning nearly thirty social welfare organizations with regard to thirteen recall elections. Defendants did not investigate this appearance of impropriety. ████████████████████████████████ ████████████████████████████.

152.    AFL-CIO's annual report filed with the Department of Labor in September 2012 shows a $69,500 expenditure to the Center for Media and Democracy under Schedule 16 for "Political Activities and Lobbying," with the stated purpose of "Support of State Legislative Advocacy." But according to GAB's records, the Center for Media and Democracy, which is a 501(c)(3), was not a registered lobbyist at the relevant time period, and top staffers of the group were not registered as individual lobbyists. Lobbying without the proper registration violates

Wisconsin state law, but the Defendants did not investigate this appearance of impropriety. █████

███████████████████████████████████████████████████████████

153.    In November 2012, the Federal Election Commission fined the Professional Firefighters of Wisconsin and eleven former board members $58,000 for knowingly and willfully violating campaign laws and regulations. This union is also a state committee in Wisconsin, has donated to Democratic candidates in Wisconsin (including Kathleen Falk), and has activities on the state level. Defendants did not investigate this appearance of impropriety,

███████████████████████████████████████████████████████████

██████████

154.    In November 2013, the Center for Media and Democracy, a left-wing 501(c)(3) hosted a conference call between reporters and its director Lisa Graves, who is well connected with Democratic Party members in Madison, Milwaukee, and statewide. One reporter asked about the investigation and whether the same activity being investigated had occurred among liberal and Democratic groups. Graves's response indicated that such activity did occur, but was distinguishable, she said, because "they're advancing not just an ideological agenda but an agenda that helps advance the bottom line of their corporate interests. That's quite a distinct difference from some of the funders in the progressive universe." ████████████████

███████████████████████████████████████████████████████████

█████████████████████████████

155.    Upon information and belief, numerous other activities materially identical to the activities giving rise to the manifold branches of this massive investigation have occurred within Democratic campaigns and among left-wing issue advocacy and independent expenditure

groups. Defendants did not investigate any of this conduct. ████████████████████████

████████████████████████████████████.

    156. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**F.**     **The Investigation Has Had the Purpose and Effect of Influencing Wisconsin Politics**

    157. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ In fact, information from the investigation routinely reached the public at critical times during the 2010 gubernatorial election, the 2011 budget battle, and the 2011 and 2012 recall elections. Upon information and belief, some of this information reached the public through direct or indirect selective leaks from the DA's Office. Other information reached the public through other avenues ██████████████

██████████████████████. John Doe has repeatedly been a political rallying cry—and even a fundraising tool—for Democrats at each turn in influence important political events.

    158. Upon information and belief, the first reports of the investigation were leaked to the press in the days following Scott Walker's victory in the Republican primary. Thirteen days after that election, Daniel Bice of the *Milwaukee Journal Sentinel* gave the first public report on the investigation. Citing unnamed sources, Bice informed the public that the John Doe

48

proceeding consisted of "two investigations," one into Gardner's campaign contributions and the other related to Milwaukee County employees and Darlene Wink's resignation. The article did not mention the Operation Freedom funds, but made sure to draw connections with the upcoming gubernatorial race. The source of this information was, by necessity, direct or indirect leaks from the Milwaukee County Attorney's Office, which operated under the control of Defendant Chisholm.

159.    The day before the gubernatorial election, investigators chose to execute search warrants into Rindfleisch's residence and the Milwaukee County Offices, evidently with the hope of attracting some last minute John Doe attention before the election. Nothing would have prevented investigators from delaying the searches a few days until after the election.

160.    In January 2012, Democratic Party Chairman Michael Tate sent out an email solicitation to supporters, asking them to give $10 "so we have the resources we need to expose Scott Walker's latest scandal involving more than $60,000 that was stolen from military veterans and their families." A spokesman for state Democrats explained that "Using these facts about Walker to motivate our base and muster resources to fight his vast sums of sleazy corporate cash is entirely appropriate."

161.    In February and the following months of 2012, Scott Walker made several disclosures related to the investigation, first, that he had hired criminal defense attorneys to represent him in the matter, next, that he had established an official criminal defense fund, and later, that he had been reimbursed for legal expenses paid from his own pocket from his campaign. Numerous articles online and in print and advertisements followed each disclosure, ridiculing Walker and calling him a corrupt government official. The John Doe investigation,

thus, harmed Scott Walker politically, but the Secrecy Orders prevented him from defending himself adequately to the public.

162.    On April 15, 2012, Daniel Bice reported that the John Doe investigation presented the "biggest question hanging over" the recall election. In particular, the article asked whether Chisholm would file additional criminal charges before the June 5 election. In fact, as of three months earlier, all complaints that would ever be filed to date from the investigation had already been filed. But the investigation continued as a means of attempting to influence the outcome of the recall election.

163.    On May 28, 2012, the *Milwaukee Journal-Sentinel* reported that the John Doe investigation had zeroed in on key evidence related to the 2010 county bidding process that implicated Scott Walker and his longtime campaign advisor John Hiller. The report quotes some inside sources, upon information and belief directly or indirectly from the County Attorneys' Office, as calling this lead "a bombshell" and hinting that a criminal complaint might be in the works. The election was one week away.

164.    On May 30, 2012, six days from the election, the Democratic Party of Wisconsin used the John Doe proceeding for further political advantage in a press release announcing that Walker had "mistakenly" admitted that he was under criminal investigation by referencing his criminal defense fund. The press release also played up the home raids on Rindfleisch and Archer as evidence of the severity of the matter. News coverage of this and similar advertising efforts was extensive, as reporters speculated about possible impending criminal charges against Walker at this critical time in Wisconsin politics.

165.    In the final days before the 2012 gubernatorial recall, Tom Barrett made John Doe central to his campaign. Near the end of May 2012, his campaign issued advertisements

50

discussing the John Doe investigation and particular evidence it had uncovered and asserting that the evidence showed criminal misconduct by the governor and his employees. These assertions were false as there was no misconduct by the governor, but the continuing John Doe investigation by Chisholm—who had publicly supported Barrett in past elections—lent them improper credibility.

166. On May 31, the County Attorney's Office indicated that it granted immunity to Fran McLaughlin, former county spokeswoman, in the John Doe proceeding, and Tom Barrett's campaign issued a statement calling on Walker to "come clean with the people of Wisconsin" and asserting that "his credibility is stretched to the limit."

167. On June 1, in the final debate of the recall election, Barrett repeatedly used the John Doe investigation as a line of attack against Walker.

168. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

169. The first public announcement of the new phase of the investigation was on October 21, 2013, in a Daniel Bice article in the *Milwaukee Journal-Sentinel*. Bice cited unnamed sources and provided the basic facts of the investigation, including that special prosecutor Schmitz had been appointed to run the investigation, that it had "spread to at least five counties," and that Defendant Landgraf had been investigating "'all over the place.'" Much of the activity was occurring in Madison and little information was known until rather recently, said

51

the article. The subject matter of the investigation was events occurring since 2010, it said. █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████

170.     Around November 19, 2013, Democratic Party-affiliated Senate Minority Leader Chris Larson and the State Senate Democratic Committee issued a fundraising appeal based on the investigation, asking donors to contribute $29 to fight against the 29 conservative groups that were under investigation.

171.     When asked about the investigation, the Democratic Party Chairman was quoted as stating that "[y]ou can assume they're finding serious acts of wrongdoing."

172.     Upon information and belief, the Defendants intend selectively to leak information from the investigation to the media ███████████████████████████████ ██████████████████████████████████████████████████.

**G.     The Convictions Obtained from the Investigation Do Not Legitimize It**

173.     The investigation has, to date, been a complete failure. Although the Milwaukee County District Attorney's Office paraded six convictions around in support of its legitimacy, none of these convictions in any way implicated Walker's staff for campaign-finance violations, the county bidding process, or Walker's conduct of his gubernatorial administration, and, thus, the convictions can in no way legitimize these detours. Thus, the convictions are entirely unrelated to the politicized bent of the investigation—which turned up nothing██████████████ ██████████████████████████████.

174.     In October 2012, Kevin Kavanaugh was convicted of embezzlement from the funds belonging to Operation Freedom. Kavanaugh's conviction simply represents what would

have been the result of a disciplined, ethical investigation undertaken without political motivation. Although issues related to Operation Freedom were the original purpose of the first John Doe petition, little evidence used in the criminal complaint against Kavanaugh resulted from the John Doe investigation, as all but one interview described therein was given by a willing witness without a secrecy order.

175.    In November 2012, Timothy Russell pled guilty to one felony count of embezzlement for theft from the Operation Freedom funds. As with Kavanaugh's conviction, Russell's conduct would have been discovered simply by investigating the Operation Freedom funds and is unrelated to the political campaign waged by the investigation.

176.    In April 2011, William Gardner pled guilty to campaign-finance related violations. Although Defendants Chisholm and Landgraf used the Gardner aspects of the investigation as a pretext to turn John Doe into a political investigation, all critical evidence was gathered outside the John Doe investigation. Gardner was sentenced to community service and probation.

177.    In October 2012, Kelly Rindfleisch pled guilty to one count of misconduct for doing campaign work for lieutenant governor candidate Brett Davis while at work for Milwaukee County. She agreed to the plea because she lacked the funds to mount a legal defense and hoped to avoid jail time to care for her 88-year-old, ailing mother. At her sentencing hearing, Landgraf falsely alleged impropriety on behalf of Scott Walker. In doing so, Landgraf disclosed materials covered by the Secrecy Order that did not relate to the case against Rindfleisch. Rindfleisch's conviction is not remotely related to the initial justification for the John Doe investigation and is not related to ongoing inquiries.

178.    In February 2012, Darlene Wink pled guilty to political fundraising in a courthouse. As with Rindfleisch, her conviction is the result of prosecutors turning peoples' lives upside down in a politically motivated fishing expedition. Defendants Chisholm and Landgraf chose not to apply the same scrutiny to liberal individuals. Both Fleming and Liebenthal provided similar opportunities to use the power of their office to scrutinize individuals for campaign-related technical impropriety, and they declined. Meanwhile, Wink was the first channel used to launch the investigation, and her conviction does not relate to the initial justification for the John Doe investigation and is not related to ongoing inquiries.

179.    In January 2013, Russell's domestic partner pled guilty to a misdemeanor charge of contributing to the delinquency of a minor and was subsequently sentenced to 50 hours community service. There is no relationship whatsoever between this conviction and the goals or legal theories of the ongoing investigation.

## III.    The Investigation Is Calculated To Chill Protected Speech

180.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████

181.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

182. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

183. The natural and probable consequence of the investigation is therefore to chill speech and association.

**IV. The Investigation Has Actually Chilled First Amendment Protected Speech and Associational Activities**

184. Plaintiff Eric O'Keefe's nationwide political activities were debilitated ████████ ████████████████████████, and he ██████████████████████████████████ will continue to remain on the sidelines in Wisconsin until the investigations end.

185. Plaintiff WCFG has been sidelined entirely and has ceased all First Amendment protected activity.

186. As the investigation is ongoing throughout the 2014 legislative session and campaign period, the investigation will have the intended effect of silencing Plaintiffs in Wisconsin during the 2014 legislative session and election cycle.

187. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

55

188.

189.

190.

191.

192.

193.

194.

195.

██████████████████████████████████████████

████████████████████████████████

## COUNT I:
## RETALIATION IN VIOLATION OF THE
## FIRST AND FOURTEENTH AMENDMENTS

196.    Plaintiffs repeat and re-allege the averments of paragraphs 1-195 as if fully set forth herein.

197.    Plaintiffs engaged in activity protected by the First Amendment, including, without limitation, sponsoring, creating, and publishing issue advocacy relative to the Budget Repair Bill and other issues during the 2011 and 2012 recall elections.

198.    Defendants' conduct under color of state law would deter First Amendment activity of a person of reasonable firmness and that has, in fact, deterred the First Amendment activity of Plaintiffs and others. This deprivation of Plaintiffs' rights constitutes irreparable harm.

199.    Plaintiffs' First Amendment activity, including the particular viewpoints they expressed, was the primary or at least a substantial motivating factor in the Defendants' decision to take their retaliatory actions.

200.    As a direct result of Defendants' violation of his First and Fourteenth Amendment rights, Plaintiffs have sustained damages in an amount to be determined at trial. The right to be free from retaliation for exercise of constitutional rights, including the First Amendment, is well established and reasonable officers in the position of Defendants would know that retaliating against Plaintiffs and others based on the content and viewpoint of their speech is unlawful.

201.    Unless Defendants are enjoined from committing the above-described constitutional violation, Plaintiffs will continue to suffer irreparable harm.

## COUNT II:
## SELECTIVE USE OF PROSECUTORIAL POWER IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

202.    Plaintiffs repeat and re-allege the averments of paragraphs 1-195 as if fully set forth herein.

203.    Defendants, acting under color of state law, have singled out Plaintiffs as targets for investigation ██████████████████████████████████ while others similarly situated were not targeted.

204.    The decision to target Plaintiffs was based on arbitrary classifications, including without limitation, the exercise of their First Amendment rights and the content and viewpoint of their First Amendment protected speech. This conduct has deprived and continues to deprive Plaintiffs of their rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, causing them irreparable harm.

205.    As a direct result of Defendants' violation of the First and Fourteenth Amendments, Plaintiffs have sustained damages in an amount to be determined at trial.

206.    Unless Defendants are enjoined from committing the above-described constitutional violations, Plaintiffs will continue to suffer irreparable harm.

## COUNT III:
## BAD FAITH EXERCISE OF PROSECUTORIAL POWER WITH NO LEGITIMATE GOVERNMENT PURPOSE IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

207.    Plaintiffs repeat and re-allege the averments of paragraphs 1-195 as if fully set forth herein.

208.    The Defendants' continued investigation into Plaintiffs, under color of law, has no reasonable possibility or expectation of obtaining a lawful conviction.

58

209.    The Defendants' investigation into Plaintiffs' activities is in bad faith and has the purpose of retaliating against Plaintiffs for exercise of their constitutional rights, including without limitation freedom of speech and association, and has the purpose of discouraging and preventing the exercise of their constitutional rights, including without limitation free speech and association, in the future.

210.    Defendants' continued investigation into Plaintiffs has thereby deprived them and continues to deprive them of their rights under the First and Fourteenth Amendments, causing irreparable harm.

211.    As a direct result of Defendants' violation of the First and Fourteenth Amendments, Plaintiffs have sustained damages in an amount to be determined at trial.

212.    Unless Defendants are enjoined from committing the above-described constitutional violation, Plaintiffs will continue to suffer irreparable harm.

**COUNT IV:**
**INFRINGEMENT OF FIRST AMENDMENT PRIVILEGE IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**

213.    Plaintiffs repeat and re-allege the averments of paragraphs 1-195 as if fully set forth herein.

214.    ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

215.    ████████████████████████████████████████
████████████████████████████████████

216.    ████████████████████████████████████████
████████████████████████████████████████████████

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

217.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

218.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮

219.  As a result of Defendants' violation of the Fourth and Fourteenth Amendments, Plaintiffs have sustained damages in an amount to be determined at trial.

220.  Unless Defendants are enjoined from committing the above-described constitutional violation, Plaintiffs will continue to suffer irreparable harm.

**COUNT V:**
**INFRINGEMENT OF THE RIGHT OF FREE SPEECH IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**

221.  Plaintiffs repeat and re-allege the averments of paragraphs 1-195 as if fully set forth herein.

222.  The First Amendment protects Plaintiffs' speech about government officials, the conduct of state government, and other matters of public interest.

223.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

60

224. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

225.   Unless Defendants and Peterson are enjoined from committing the above-described constitutional violation, Plaintiffs will continue to suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and Peterson, including:

a) A finding that Defendants' acts and conduct constitutes a violation of Plaintiffs' constitutional rights, including those guaranteed by the First and Fourteenth Amendments;

b) Both preliminary and permanent injunctions restraining Defendants and all those in privity, concert, or participation with them from continuing the John Doe investigation;

c) An order relieving O'Keefe, WCFG, and others from any duty to cooperate further with Defendants in their bad faith investigation;

d) ████████████████████████████████████████████

████████████████████████████████████████

e) ████████████████████████████████████████

f) Compensatory damages sustained as a result of Defendants' unlawful deprivation of Plaintiffs' constitutional rights;

g) An award of the attorneys' fees and costs and other expenses, including pre-judgment and post-judgment interest, that Plaintiffs have been forced to incur; and

h) Any and all other relief that the Court determines is just and proper.

61

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs respectfully demand a trial by jury of all issues triable by a jury in their Complaint.

Dated:   February 10, 2014                                Respectfully submitted,

                                                          /s/ David B. Rivkin

Edward H. Williams                      David B. Rivkin*
BakerHostetler LLP                      Gregory L. Baker*
191 North Wacker Drive, Suite 3100      Lee A. Casey*
Chicago, IL 60606                       Mark W. DeLaquil*
(312) 416-6229                          Andrew M. Grossman*
ehwilliams@bakerlaw.com                 Richard B. Raile*
                                        BakerHostetler LLP
                                        1050 Connecticut Ave., N.W., Suite 1100
                                        Washington, D.C. 20036
                                        (202) 861-1731
                                        drivkin@bakerlaw.com

*Attorneys for Plaintiffs*

* Admission to the Eastern District of Wisconsin pending

# Exhibit A

STATE OF WISCONSIN      CIRCUIT COURT      MILWAUKEE COUNTY

IN THE MATTER OF A JOHN DOE PROCEEDING      Case No.

## PETITION FOR COMMENCEMENT OF A JOHN DOE PROCEEDING

MAY 3 1 2012

WHEREAS, I, Bruce J. Landgraf, Assistant District Attorney in and for the County of Milwaukee have been assigned to an investigation in the County of Milwaukee, State of Wisconsin, relating to potential crimes including, but not limited to, a violation of Wisconsin Statutes §943.20(1)(b), Theft by Bailee;

WHEREAS, based upon the investigation as set forth in the attached Affidavit of Investigator Jeffrey Doss, I have reson to believe that a violation of §943.20(1)(b) of the Wisconsin Statutes, Theft by Bailee, has taken place and further, I have reason to believe this violation has been committed within the jurisdiction of this court; and

WHEREAS, I believe based upon these investigations that further information concerning this criminal violation can be revealed via a John Doe proceeding;

NOW, THEREFORE, based upon the information contained in the attached Affidavit of Investigator Jeffrey Doss showing evidence that a criminal violation of Wisconsin Statutes §943.20(1)(b), Theft by Bailee, may have been committed in Milwaukee County, I hereby request that a John Doe proceeding, pursuant to Section 968.26, Stats., be conducted and that witnesses be subpoenaed and questioned on oath relating thereto.

FURTHER, I request that these John Doe proceedings be secret for the following reasons. This investigation will focus upon "Operation Freedom," an annual event sponsored by the Office of the Milwaukee County Executive. According to the Operation Freedom 2006 flyer, the event is intended to "thank. . . our United States Armed Forces members and Veterans for a Job Well Done." In about 2006, the Military Order of the Purple Heart ("the Order") received monies from Milwaukee County for the purpose of administering expenses related to Operation Freedom. No satisfactory explanation for the disposition of about $11,000 has been forthcoming from the Order. As part of the pre-Doe investigation, Investigator Jeffrey Doss sought to obtain documentation that would form the basis of tracing the funds from Milwaukee County to the Order. The Office of the County Executive has been unwilling or unable

EXHIBIT B    226883 A

to provide such documentation. It is unclear at this juncture why the Office of the County Executive has not produced (or has not caused another Department to produce) these records. Consequently, it is expected that this investigation will lead to an examination of business records maintained by the County Executive's office and other county Departments. Likewise, I anticipate subpoenaing county officials as part of an effort to identify the origin of the funds transferred to the Order. If held publicly, an investigation into this matter will likely be the subject of significant publicity in the print and broadcast media. This publicity of allegations and inferences would be particularly unfair to the County Executive, a man who is seeking the nomination of the Republican Party for the Office of Governor of the State of Wisconsin in this Election Year. While it was possible to approach and potentially interview witnesses outside the construct of a John Doe proceeding, such an investigative tactic has not yielded satisfactory results. It may be that the County Executive's Office is reluctant to provide information to investigators due to a fear of political embarrassment. It is therefore my opinion that the formality and the secrecy of a John Doe proceeding will increase the likelihood of complete and frank statements by persons who may – in an informal, non-secret setting – feel uneasy about providing a candid, voluntary statement.

FURTHER, for these reasons, I respectfully submit that the balance between – on the one hand - the public's right to be informed about this John Doe proceeding, and – on the other hand - the legitimate need to maintain the secrecy of these proceedings, must be struck, at this juncture, in favor of a secret proceeding. *In re John Doe Proceeding*, 2003 WI 30, 260 Wis.2d 653, 660 N.W.2d 260 at ¶66.

FURTHER, notwithstanding any secrecy order, I request that the court allow the following classes of persons to have access to the record of the John Doe proceedings to the extent necessary to perform their duties: all prosecutors, support staff and investigative staff of the Milwaukee County District Attorney's Office. I anticipate individuals from the investigative staff of the District Attorney's Office will assist during the John Doe investigation and will conduct work both in support of the John Doe investigation and in response to information gathered at the John Doe hearings.

FURTHER, notwithstanding any secrecy order, I request the court to allow prosecutors and investigators acting in support of the John Doe proceeding to use the

2

226884

information, transcripts, documents and other materials that will be gathered in this investigation for all appropriate law enforcement purposes, including but not limited to the interview of witnesses in support of this investigation.

FINALLY, as to the scope of the secrecy order, I request that the court order that secrecy be maintained during this John Doe proceedings as to court docket and activity records, court filings, process issued by the court, information concerning the questions asked and the answers given during a John Doe hearing, transcripts of the proceedings, exhibits and other papers produced during the proceedings, as well as to all other matters observed or heard in the John Doe proceeding. See, generally, *In re John Doe Proceeding*, 2003 WI 30 at ¶62.

Dated this 5 day of May 2010.

Bruce J. Landgraf
Assistant District Attorney
State Bar Number 01009407
bruce.landgraf@da.wi.gov

P.O. Address
Safety Building Room 405
821 West State Street
Milwaukee, Wisconsin 5323
(414) 278-4645 – Voice
(414) 223-1929 – Fax

3

226885

# Exhibit B

[Redacted]

# Exhibit C

[Redacted]

# Exhibit D

[Redacted]

# Exhibit E

[Redacted]

# Exhibit F

[Redacted]