# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ERIC O'KEEFE and WISCONSIN CLUB FOR
GROWTH, Inc.,

     Plaintiffs,

   **-vs-**


FRANCIS SCHMITZ, in his official and personal
capacities,

JOHN CHISHOLM, in his official and personal
capacities,

BRUCE LANDGRAF, in his official and personal
capacities,

DAVID ROBLES, in his official and personal
capacities,

DEAN NICKEL, in his official and personal
capacities, and

GREGORY PETERSON, in his official capacity,

     Defendants.

       **Case No.  14-C-139**

---

## DECISION AND ORDER

---

   This case requires the Court to decide the limits that government can place on

First Amendment political speech.  It comes to the Court with more than the usual

urgency presented by First Amendment cases because the defendants seek to

criminalize the plaintiffs' speech under Wisconsin's campaign finance laws.

Defendants instigated a secret John Doe investigation replete with armed raids on

homes to collect evidence that would support their criminal prosecution. Plaintiffs move for a preliminary injunction to stop the defendants' investigation.

## I. Background

Eric O'Keefe is a veteran volunteer political activist who has been involved in political and policy advocacy since 1979. O'Keefe is a director and treasurer for the Wisconsin Club for Growth ("WCFG" or "the Club"), a corporation organized under the laws of Wisconsin and recognized as a non-profit entity under Section 501(c)(4) of the Internal Revenue Code. WCFG is a local, independent affiliate of the national organization Club for Growth. Its purpose is to advance free-market beliefs in Wisconsin.

O'Keefe's advocacy came to the forefront during the political unrest surrounding Governor Scott Walker's proposal and passage of 2011 Wisconsin Act 10, also known as the Budget Repair Bill. The Bill limited the collective bargaining rights of most public sector unions to wages. The Bill also increased the amounts that state employees paid in pension and health insurance premiums. O'Keefe, the Club, and its supporters immediately recognized the importance of the Bill to the Club's mission of promoting principles of economic freedom and limited government. The Club viewed the Bill as a model that, if successful, might be replicated across the country.

Throughout this period, the Club enlisted the advice of Richard "R.J." Johnson, a long-time advisor to WCFG. Johnson is a veteran of Wisconsin politics and is intimately familiar with the political lay of the land. WCFG generally trusted

- 2 -

Johnson's professional judgment as to the best methods of achieving its advocacy goals.

Because of the intense public interest surrounding the Bill, O'Keefe and Johnson believed that advocacy on the issues underlying the Bill could be effective in influencing public opinion. O'Keefe and Johnson were also concerned about the large amounts of money being spent by unions and other left-leaning organizations to defeat the bill. Accordingly, O'Keefe raised funds nationwide to support issue advocacy in favor of the Bill, and Johnson took an active role in creating WCFG's communications and, where appropriate, advising WCFG to direct funding to other organizations that would be better suited to publish communications strategically advantageous to advancing the Club's policy goals. One notable advocacy piece, which was fairly typical, aired in major markets in February of 2011. In it, WCFG argued that the reforms of the Budget Repair Bill were fair because they corrected the inequity of allowing public workers to maintain their pre-recession salaries and benefits while the salaries and benefits of private sector employees were being reduced. This piece did not name a candidate and did not coincide with an election. The Club was the first group to run communications supporting the collective bargaining reforms. *See Support Governor Walker's Budget Repair Bill*, YouTube.com (Uploaded Feb. 14, 2011).[1] More generally, the Club's issue advocacy related to the Budget Repair Bill,

---

[1] http://www.youtube.com/watch?v=yYEgoxdxzA0.

- 3 -

issues in the 2011 Wisconsin Supreme Court campaign, key issues in the 2011 and 2012 Senate recall campaigns, and key issues in the 2012 general election campaign. WCFG did not run issue communications related to the Walker campaign or the Walker recall petition.

The Milwaukee Defendants — District Attorney John Chisholm, along with Assistant District Attorneys Bruce Landgraf and David Robles — had been investigating Governor Walker through the use of a John Doe proceeding beginning in 2010. The initial focus of the first proceeding was the embezzlement of $11,242.24 that Milwaukee County had collected for the local Order of the Purple Heart while Walker was serving as Milwaukee County Executive. From there, the first John Doe developed into a long-running investigation of all things Walker-related. *See, e.g.,* ECF No. 7-2, Declaration of David B. Rivkin, Ex. 17 (Dave Umhoefer and Steve Schultze, *John Doe Investigation Looks Into Bids to House County Worker*, Milwaukee Journal Sentinel (Jan. 25, 2012))[2], Ex. 18 (*Assistant D.A. Still Silent on Doe Records Request*, Wisconsin Reporter (Oct. 10, 2012)).[3] The first John Doe resulted in convictions for a variety of minor offenses, including illegal fundraising

---

[2] http://m.jsonline.com/topstories/138020933.htm.

[3] http://watchdog.org/58691/wiassistant-d-a-still-silent-on-doe-records-request/.

and campaigning during work hours. *Id.*, Ex. 20 (Steve Schultze, *Former Walker Aide Pleads Guilty, Will Cooperate with DA*, Milwaukee Journal Sentinel (Feb. 7, 2012)).[4] During this timeframe, Walker was elected governor and survived a recall election.

In August of 2012, Milwaukee County District Attorney John Chisholm initiated a new John Doe proceeding in Milwaukee County. Drawing on information uncovered in the first John Doe, the new investigation targeted alleged "illegal campaign coordination between Friends of Scott Walker [FOSW], a campaign committee, and certain interest groups organized under the auspices of IRC 501(c)(4)" — in other words, social welfare organizations like the Club. *Id.*, Ex. 28 (Chisholm Letter to Judge Kluka, Aug. 22, 2013).

In early 2013, Chisholm asked Wisconsin Attorney General J.B. Van Hollen to take the investigation statewide. Van Hollen refused, citing conflicts of interest. Van Hollen also explained as follows:

> This is not a matter, however, where such devices should be employed, even if they could be employed effectively. This is because there is no necessity, at this time, for my office's involvement because there are other state officials who have equal or greater jurisdictional authority without the potential disabilities I have mentioned. The Government Accountability Board has statewide jurisdiction to investigate campaign finance violations, which may be civil or criminal in nature. Thus, there is no jurisdictional necessity to involve my office. Should the Government Accountability Board, after investigation, believe these matters are appropriate for civil enforcement, they have the statutory authority to proceed. Should the Government Accountability Board determine, after investigation, that criminal enforcement is appropriate,

---

[4] http://www.jsonline.com/news/milwaukee/former-walker-aide-pleads-guilty-to-cooperate-withda-oc43ojt-138874409.html.

- 5 -

they may refer the matter to the appropriate district attorney. Only if that district attorney and a second district attorney declines to prosecute would my office have prosecutorial authority.

*Id.*, Ex. 29 (Van Hollen Letter to Chisholm, May 31, 2013). Accordingly, Van Hollen was under the apparent impression that the GAB was not involved in the investigation, advising Chisholm that the GAB "as a lead investigator and first decisionmaker is preferable in this context." *Id.* In reality, Chisholm had already consulted with the GAB, and it appears that the GAB was involved since the outset of the investigation. ECF No. 109-1, Chisholm's Supplemental Response Brief at 16; ECF No. 120-7, Plaintiffs' Supplemental Memorandum, Ex. I.

In June of 2013, the GAB issued a unanimous resolution authorizing the use of its powers under Wisconsin Statutes, including "the issuance of subpoenas to any organization or corporation named in the John Doe materials, its agents and employees, and to any committee or individual named in the John Doe materials . . ." ECF No. 120, Declaration of Samuel J. Leib, Ex. A. The GAB resolution also provided that the Board's agents "may investigate any action or activity related to the investigation's purpose, including criminal violations of Chapter 11." *Id.*

Thereafter, District Attorneys from four other counties — Columbia, Dane, Dodge, and Iowa — opened parallel John Doe proceedings. Concerned that the investigation would appear partisan, Chisholm wrote to then-presiding Judge Barbara Kluka that "the partisan political affiliations of the undersigned elected District Attorneys will lead to public allegations of impropriety. Democratic prosecutors will

- 6 -

be painted as conducting a partisan witch hunt and Republican prosecutors will be accused of 'pulling punches.' An Independent Special Prosecutor having no partisan affiliation addresses the legitimate concerns about the appearance of impropriety." Rivkin Dec., Ex. 28 (Aug. 22, 2013 Letter). Accordingly, at Chisholm's request, Judge Kluka appointed former Deputy United States Attorney Francis Schmitz as special prosecutor to lead the five-county investigation.

Early in the morning of October 3, 2013, armed officers raided the homes of R.J. Johnson, WCFG advisor Deborah Jordahl, and several other targets across the state. ECF No. 5-15, O'Keefe Declaration, ¶ 46. Sheriff deputy vehicles used bright floodlights to illuminate the targets' homes. Deputies executed the search warrants, seizing business papers, computer equipment, phones, and other devices, while their targets were restrained under police supervision and denied the ability to contact their attorneys. Among the materials seized were many of the Club's records that were in the possession of Ms. Jordahl and Mr. Johnson. The warrants indicate that they were executed at the request of GAB investigator Dean Nickel.

On the same day, the Club's accountants and directors, including O'Keefe, received subpoenas demanding that they turn over more or less all of the Club's records from March 1, 2009 to the present. The subpoenas indicated that their recipients were subject to a Secrecy Order, and that their contents and existence could not be disclosed other than to counsel, under penalty of perjury. The subpoenas' list of advocacy groups indicates that all or nearly all right-of-center groups and individuals

- 7 -

in Wisconsin who engaged in issue advocacy from 2010 to the present are targets of the investigation. *Id.*, Ex. 34 (O'Keefe Subpoena); *see also* Ex. 33 (*Wisconsin Political Speech Raid*, Wall Street Journal (Nov. 18, 2013), explaining that the subpoenas target "some 29 conservative groups, including Wisconsin and national nonprofits, political vendors and party committees").[5]

The Club moved to quash the subpoenas and also to suspend inspection of privileged documents seized from its political associates. In response, the prosecutors argued that the subpoena targets and others were engaged in a "wide-ranging scheme to coordinate activities of several organizations with various candidate committees to thwart attempts to recall Senate and Gubernatorial candidates" through a "nationwide effort to raise undisclosed funds for an organization which then funded the activities of other organizations supporting or opposing candidates subject to recall." *Id.*, Ex. 38, State's Consolidated Response to Motions to Quash. According to the prosecutors, R.J. Johnson controlled WCFG and used it as a "hub" to coordinate fundraising and issue advocacy involving FOSW and other 501(c)(4) organizations such as Citizens for a Strong America, Wisconsin Right to Life, and United Sportsmen of Wisconsin. *Id.* Judge Gregory Peterson, who became the presiding judge after Judge Kluka's recusal, granted the motion to quash the subpoenas because there was "no evidence of express advocacy." He then stayed his order pending appeal. *Id.*, Ex. 48, 49.

---

[5] http://online.wsj.com/news/articles/SB10001424052702304799404579155953286552832.

The current John Doe investigation has "devastated" O'Keefe's ability to undertake issue advocacy with WCFG. O'Keefe Dec., ¶ 40. O'Keefe lost most of his fundraising abilities for the Club immediately because: (1) it would be unethical to raise money without disclosing that he is a target in a criminal investigation; (2) it would be unwise for prospects to invest the time required for them to independently evaluate any risks; (3) the secrecy order purports to bar O'Keefe from disclosing the facts of the investigation and the reasons he believes that WCFG is not guilty of any crimes; and (4) O'Keefe cannot assure donors that their information will remain confidential as prosecutors have targeted that information directly. As a result, O'Keefe estimates that the Club has lost $2 million in fundraising that would have been committed to issue advocacy. *Id.*, ¶ 49.

Moreover, O'Keefe is an active board member in several national organizations engaging in issue advocacy outside of WCFG. O'Keefe's activities with those groups have been "dramatically impaired" in the following ways. First, O'Keefe's own time has been diverted from national issues and investment activities to the response and defense against the John Doe investigation. Second, many of the people O'Keefe works with are named in the subpoenas and likely received subpoenas themselves, putting them on notice of the investigation and leading them to believe that O'Keefe may be in legal trouble and that they may suffer consequences by association. Third, the mailing of subpoenas around the country has disclosed to O'Keefe's political network that there are risks to engaging in politics in Wisconsin.

- 9 -

Many of the people O'Keefe has previously dealt with apparently do not want to communicate with O'Keefe about political issues. The subpoenas serve as a warning to those individuals that they should not associate with the Club. *Id.*, ¶ 50.

Ultimately, and perhaps most importantly, the timing of the investigation has frustrated the ability of WCFG and other right-leaning organizations to participate in the 2014 legislative session and election cycle. *Id.*, ¶ 60.

## II.    Analysis

To obtain a preliminary injunction, O'Keefe and the Club must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the "balance of equities" tips in their favor (i.e., denying an injunction poses a greater risk to O'Keefe and the Club than it does to the defendants), and that issuing an injunction is in the public interest. *Smith v. Exec. Dir. Of Ind. War Mem'l Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). Since "unconstitutional restrictions on speech are generally understood not to be in the public interest and to inflict irreparable harm that exceeds any harm an injunction would cause," the plaintiffs' "main obstacle to obtaining a preliminary injunction" is "demonstrating a likelihood of success on the merits." *Id.* (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).

### A.    Likelihood of Success

**"Congress [and hence the States via application of the Fourteenth Amendment] shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.**

It bears repeating that we are a country with a government that is of the people, by the people, and for the people. Said another way, it is a country with a government that is of the Constitution, by the Constitution, and for the Constitution. The Constitution is a pact made between American citizens then and now to secure the blessings of liberty to themselves and to their posterity by limiting the reach of their government into the inherent and inalienable rights that every American possesses.

In this larger sense, the government does not run the government. Rather, the people run their government, first within the framework of the restrictions placed on government by the Constitution, and second by the constitutional rights each citizen possesses that are superior to the operation of government.

One of these rights is the First Amendment right to speak freely, which "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The First Amendment is "[p]remised on mistrust of governmental power," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010), and its vigorous use assures that government of the people remains so. When government attempts to regulate the exercise of this constitutional right, through campaign finance laws or otherwise, the danger always exists that the high purpose of campaign regulation and its enforcement may conceal self-interest, and those regulated by the Constitution in turn become the regulators. *See generally* Allison R. Hayward, *Revisiting the Fable of Reform*, 45 Harv. J. on

Case 2:14-cv-00139-RTR   Filed 05/06/14   Page 11 of 26   Document 181-1

Legis. 421 (2008). And "those who govern should be the *last* people to help decide who *should* govern." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1441-42 (2014) (emphasis in original). In this respect, First Amendment protection "reaches the very vitals of our system of government," as explained by Justice Douglas:

> Under our Constitution it is We the People who are sovereign. The people have the final say. The legislators are their spokesmen. The people determine through their votes the destiny of the nation. It is therefore important — vitally important — that all channels of communication be open to them during every election, that no point of view be restrained or barred, and that the people have access to the views of every group in the community.

*United States v. Int'l Union United Auto., Aircraft & Agric. Workers of Am.*, 352 U.S. 567, 593 (1957) (dissenting opinion).

Therefore any attempt at regulation of political speech is subject to the strictest scrutiny, meaning that it is the government's burden to show that its regulation is narrowly tailored to achieve the only legitimate goal of such regulation — preventing *quid pro quo* corruption or the appearance thereof as it pertains to elected officials or candidates. Applying strict scrutiny to this case, the plaintiffs have shown, to the degree necessary on the record before the Court, that their First Amendment rights are being infringed by the defendants' actions.

The defendants are pursuing criminal charges through a secret John Doe investigation against the plaintiffs for exercising issue advocacy speech rights that on their face are not subject to the regulations or statutes the defendants seek to enforce. This legitimate exercise of O'Keefe's rights as an individual, and WCFG's rights as a

- 12 -

501(c)(4) corporation, to speak on the issues has been characterized by the defendants as political activity covered by Chapter 11 of the Wisconsin Statutes, rendering the plaintiffs a subcommittee of the Friends of Scott Walker ("FOSW") and requiring that money spent on such speech be reported as an in-kind campaign contribution. This interpretation is simply wrong.

The defendants further argue that the plaintiffs' expenditures are brought within the statute because they were coordinated by enlisting the support of R.J. Johnson, a representative and agent of FOSW. Coupled with Governor Walker's promotion and encouragement, defendants go on to argue that this activity is the type of coordination and pre-planning that gives rise to a *quid pro quo* corruption appropriate for prosecution. This additional factor also fails as a justification for infringing upon the plaintiffs' First Amendment rights. A candidate's promotion and support of issues advanced by an issue advocacy group in its effort to enhance its message through coordination cannot be characterized as *quid pro quo* corruption, "[t]he hallmark of [which] is the financial *quid pro quo*: dollars for political favors." *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm'n*, 470 U.S. 480, 497 (1985).

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court established a distinction between spending for political ends and contributing to political candidates. Contribution limits are subject to intermediate scrutiny, but expenditure limits get higher scrutiny because they "impose significantly more severe restrictions on

- 13 -

protected freedoms of political expression and association." *Buckley* at 23. "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. Therefore, laws that burden spending for political speech "get strict scrutiny and usually flunk." *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 153 (7th Cir. 2011) (collecting cases).

The standard to apply in these cases was recently made clear by the Supreme Court in *McCutcheon*. Any campaign finance regulation, and any criminal prosecution resulting from the violation thereof, must target activity that results in or has the potential to result in *quid pro quo* corruption. As the Court has explained:

> In a series of cases over the past 40 years, we have spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech. We have said that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access . . . are not corruption.' They embody a central feature of democracy – that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns.

> Any regulation must target instead what we have called '*quid pro quo*' corruption or its appearance. That Latin phrase captures the notion of a direct exchange or an official act for money. 'The hallmark of corruption is the financial *quid pro quo*: dollars for political favors.' Campaign finance restrictions that pursue other objectives, we have explained, impermissibly inject the Government 'into the debate over who should govern.' And those who govern should be the *last* people to help decide who *should* govern.

- 14 -

*McCutcheon*, 134 S. Ct. at 1441-42 (emphases in original) (internal citations omitted).

In short, combating *quid pro quo* corruption, or the appearance thereof, is the only interest sufficient to justify campaign-finance restrictions. "Over time, various other justifications for restricting political speech have been offered — equalization of viewpoints, combating distortion, leveling electoral opportunity, encouraging the use of public financing, and reducing the appearance of favoritism and undue political access or influence – but the Court has repudiated them all." *Barland* at 153-54 (collecting cases). The First Amendment "prohibits such legislative attempts to 'fine-tune' the electoral process, no matter how well intentioned." *McCutcheon* at 1450.

Stated another way, the "constitutional line" drawn in *McCutcheon* after its 40-year analysis is a ringing endorsement of the full protection afforded to political speech under the First Amendment. This includes both express advocacy speech — i.e., speech that "expressly advocates the election or defeat of a clearly identified candidate," *Buckley* at 80, and issue advocacy speech. Only limited intrusions into the First Amendment are permitted to advance the government's narrow interest in preventing *quid pro quo* corruption and then only as it relates to express advocacy speech. This is so because express advocacy speech is enabled by the infusion of money which can be called "express advocacy money." Express advocacy money is viewed in two ways. The fundamental view is that express advocacy money represents protected First Amendment speech. Another view of express advocacy money, along

- 15 -

with its integrity as First Amendment political speech, is the view that it may have a *quid pro quo* corrupting influence upon the political candidate or political committee to which it is directly given. That view holds that unlimited express advocacy money given to a political candidate may result in the *quid pro quo* corruption that *McCutcheon* and other cases describe as "dollars for political favors," or the "direct exchange of an official act for money." Hence regulation setting contribution limits on express advocacy money and preventing the circumvention of those limits by coordination is permitted.

Conversely, issue advocacy, which is enabled by what we can call "issue advocacy money," is not subject to these limitations because it is viewed only one way, and that is as protected First Amendment speech. This is not a recognition that *quid pro quo* corruption is the only source of corruption in our political system or that issue advocacy money could not be used for some corrupting purpose. Rather, the larger danger is giving government an expanded role in uprooting all forms of perceived corruption which may result in corruption of the First Amendment itself. It is a recognition that maximizing First Amendment freedom is a better way to deal with political corruption than allowing the seemingly corruptible to do so. As other histories tell us, attempts to purify the public square lead to places like the Guillotine and the Gulag.

The Court now turns to the defendants' efforts to regulate the plaintiffs' issue advocacy speech. As stated, this type of speech is viewed by the Supreme Court as

- 16 -

pure First Amendment speech, does not have the taint of *quid pro quo* corruption that exists with express advocacy speech, and is not subject to regulation. Under Wisconsin's campaign finance law, an expenditure or "disbursement," Wis. Stat. § 11.01(7), is for "political purposes" when it is done "for the purpose of influencing" an election. § 11.01(16). These types of expenditures and disbursements are subject to reporting requirements. §§ 11.05, 11.06. Failure to comply with these requirements subject the speaker to civil and criminal penalties. §§ 11.60, 11.61.

In *Buckley*, the Court held that the same operative language — "for the purpose of influencing" an election — can only apply to "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular . . . candidate." *Buckley* at 80. Later, for the "reasons regarded as sufficient in *Buckley*," the Court refused to adopt a test which turned on the speaker's "intent to affect an election. The test to distinguish constitutionally protected political speech from speech that [the government] may proscribe should provide a safe harbor for those who wish to exercise First Amendment rights. . . . A test turning on the intent of the speaker does not remotely fit the bill." *Fed. Election Comm'n v. Wis. Right to Life, Inc. (WRTL)*, 551 U.S. 449, 467-68 (2007). This is because an intent-based standard "offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." *Buckley* at 43. Accordingly, "a court should find that an ad is the functional equivalent of

- 17 -

express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL* at 469-70; *Buckley* at 44 n.52 (statute's reach must be limited to "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat, 'reject'").

It is undisputed that O'Keefe and the Club engage in issue advocacy, not express advocacy or its functional equivalent. Since § 11.01(16)'s definition of "political purposes" must be confined to express advocacy, the plaintiffs cannot be and are not subject to Wisconsin's campaign finance laws by virtue of their expenditures on issue advocacy.

However, the defendants argue that issue advocacy does not create a free-speech "safe harbor" when expenditures are coordinated between a candidate and a third-party organization. *Barland* at 155 (citing *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 465 (2001)); *see also Republican Party of N.M. v. King*, 741 F.3d 1089, 1103 (10th Cir. 2013). O'Keefe and the Club maintain that they did not coordinate any aspect of their communications with Governor Walker, Friends of Scott Walker, or any other candidate or campaign, and the record seems to validate that assertion.[6] However, the Court need not make that type of factual finding because — once again — the phrase "political purposes" under Wisconsin law means express advocacy and coordination of expenditures for issue

---

[6] Plaintiffs' Exhibit H, ECF No. 120-6.

advocacy with a political candidate does not change the character of the speech. Coordination does not add the threat of *quid pro quo* corruption that accompanies express advocacy speech and in turn express advocacy money. Issue advocacy money, like express advocacy money, does not go directly to a political candidate or political committee for the purpose of supporting his or her candidacy. Issue advocacy money goes to the issue advocacy organization to provide issue advocacy speech. A candidate's coordination with and approval of issue advocacy speech, along with the fact that the speech may benefit his or her campaign because the position taken on the issues coincides with his or her own, does not rise to the level of "favors for cash." Logic instructs that there is no room for a *quid pro quo* arrangement when the views of the candidate and the issue advocacy organization coincide.[7]

Defendants' attempt to construe the term "political purposes" to reach issue advocacy would mean transforming issue advocacy into express advocacy by interpretative legerdemain and not by any analysis as to why it would rise to the level of *quid pro quo* corruption. As the defendants argue, the Club would become a "subcommittee" of a campaign committee simply because it coordinated therewith. Wis. Stat. § 11.10(4). If correct, this means that any individual or group engaging in any kind of coordination with a candidate or campaign would risk forfeiting their right

---

[7] Moreover, if Wisconsin could regulate issue advocacy — *coordinated or otherwise* — it would open the door to a trial on every ad "on the theory that the speaker actually intended to affect an election, no matter how compelling the indications that the ad concerned a pending legislative or policy issue. No reasonable speaker would choose to run an ad . . . if its only defense to a criminal prosecution would be that its motives were pure." *WRTL* at 468.

- 19 -

to engage in political speech. The legislative tail would wag the constitutional dog.[8]

Maximizing the capability of 501(c)(4) organizations maximizes First Amendment political freedom, squares with Justice Douglas' exhortation in *Int'l Union*, *supra*, that "all channels of communication" should be open to the citizenry, and may be the best way, as it has been in the past, to address problems of political corruption. As long ago as 1835, Alexis de Tocqueville recognized that the inner strength of the American people is their capacity to solve almost any problem and address any issue by uniting in associations. Among those associations were citizen political associations utilized to prevent the "encroachments of royal power." *Democracy in America* 595 (Arthur Goldhammer trans., Library of America ed., 2004). Because associations can serve the same purpose today, their efforts should be encouraged, not restricted.

To sum up, the "government's interest in preventing actual or apparent corruption — an interest generally strong enough to justify *some* limits on contributions to candidates — cannot be used to justify restrictions on independent

---

[8] For example, if the Boy Scouts coordinated a charitable fundraiser with a candidate for office, the Boy Scouts would become a campaign subcommittee subject to the requirements and limitations of Wisconsin campaign-finance laws, exposing them to civil and criminal penalties for touting the candidate's support. *See, e.g, Clifton v. Fed. Election Comm'n*, 114 F.3d 1309, 1314 (1st Cir. 1997) ("it is beyond reasonable belief that, to prevent corruption or illicit coordination, the government could prohibit voluntary discussions between citizens and their legislators and candidates on public issues"). Similarly, if a 501(c)(4) organization like the Club coordinated a speech or fundraising dinner with a Wisconsin political candidate, all of its subsequent contributions and expenditures would be attributable to that candidate's committee and subject to the limitations of Wisconsin law. This would preclude the organization from making *any* independent expenditures after initially engaging in coordinated issue advocacy. Wis. Stat.§§ 11.05(6), 11.16(1)(a). It would also bar the organization from accepting corporate contributions which could then, in turn, be used for independent expenditures. § 11.38.

- 20 -

expenditures." *Barland* at 153 (citing *Citizens United* at 357). "Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." *Citizens United* at 365.

Issue ads by a 501(c)(4) corporation "are by no means equivalent to contributions, and the *quid-pro-quo* corruption interest cannot justify regulating them." *WRTL* at 478-79. To equate these ads to contributions is to "ignore their value as political speech." *Id.* at 479. While advocating a certain viewpoint may endear groups like the Club to like-minded candidates, "ingratiation and access . . . are not corruption." *Citizens United* at 360. O'Keefe and the Club obviously agree with Governor Walker's policies, but coordinated ads in favor of those policies carry no risk of corruption because the Club's interests are already aligned with Walker and other conservative politicians. Such ads are meant to educate the electorate, not curry favor with corruptible candidates. "Spending large sums of money in connection with elections, *but not in connection with an effort to control the exercise of an officeholder's official duties*, does not give rise to . . . *quid pro quo* corruption." *McCutcheon* at 1450 (emphasis added). While the defendants deny that their investigation is motivated by animus towards the plaintiffs' conservative viewpoints, it is still unlawful to target the plaintiffs for engaging in vigorous advocacy that is beyond the state's regulatory reach.

The defendants stress that 501(c)(4) corporations command huge sums of

- 21 -

money because there are no restrictions on contributions, and are therefore subject to abuse if they are coordinated. In addition, they emphasize that donors have a right to remain anonymous which flies in the face of the public's right to know. Again, the answer to the first concern is simply that the government does not have a right to pursue the *possibility of corruption*, only that which evinces a *quid pro quo* corruption. Defendants' view that the subject coordination could result in *quid pro quo* corruption is "speculation" that "cannot justify . . . substantial intrusion on First Amendment rights." *McCutcheon* at 1456. For it is not the extent of the coordination that matters, it is whether the issue advocacy money is used for express advocacy, and the clearest evidence of whether or not it is used for express advocacy is the type of speech produced by the money used to produce it. "The First Amendment protects the *resulting speech*." *Citizens United* at 351 (emphasis added). As it relates to the facts of this case, no investigation, much less a secret one, is required to discover any abuse of Chapter 11 of the Wisconsin Statutes. As to the second concern of anonymity, the law simply states that 501(c)(4) donors have a right to remain anonymous. The supporting rationale is that these donors serve the First Amendment by promoting issue advocacy, and that does not trigger the need for the disclosure required when one is engaged in express advocacy.

"Political speech is so ingrained in our culture that speakers find ways to circumvent campaign finance laws. Our Nation's speech dynamic is changing, and informative voices should not have to circumvent onerous restrictions to exercise their

- 22 -

First Amendment rights." *Citizens United* at 364 (internal citations omitted). The plaintiffs have found a way to circumvent campaign finance laws, and that circumvention should not and cannot be condemned or restricted. Instead, it should be recognized as promoting political speech, an activity that is "ingrained in our culture." *Id.*

Therefore, for all of the foregoing reasons, the plaintiffs are likely to succeed on their claim that the defendants' investigation violates their rights under the First Amendment, such that the investigation was commenced and conducted "without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975); *see also Collins v. Kendall Cnty., Ill.*, 807 F.2d 95, 101 (7th Cir. 1986); *Wilson v. Thompson*, 593 F.2d 1375, 1387 n.22 (5th Cir. 1979).

### B.    Remaining Factors

Having established that the plaintiffs are likely to succeed, the remaining factors can be addressed summarily, if at all. The "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,' and the 'quantification of injury is difficult and damages are therefore not an adequate remedy.'" *Alvarez*, 679 F.3d at 589 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) and *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982)). Moreover, "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute

- 23 -

that is probably unconstitutional." *Id.* (citing *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)).   Put another way, "injunctions protecting First Amendment freedoms are always in the public interest."   *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

Defendants argue that the issuance of an injunction would throw into question the validity of GAB's interpretation and administration of Wisconsin's campaign finance laws, allowing candidates to solicit large amounts of money through the guise of a 501(c)(4) organization and then direct those expenditures to benefit the candidates' campaign.   This is just another way of saying that the public interest is served by enforcing a law that restricts First Amendment freedoms.   Obviously, the public interest is served by the exact opposite proposition.

### C.   Security

Federal Rule of Civil Procedure 65(c) provides that courts can issue preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   The Court will not require the plaintiffs to post security, although it will consider a renewed application if the defendants choose to file one.   *See, e.g., N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 675 F. Supp. 2d 411, 439 n.37 (S.D.N.Y. 2009) (refusing to require security in a First Amendment case because there was "no evidence in the record to support a finding that Defendant will suffer any monetary damages as a result of this injunction"); *see*

- 24 -

*also Huntington Learning Ctr., Inc. v. BMW Educ., LLC*, No. 10-C-79, 2010 WL 1006545, at *1 (E.D. Wis. March 15, 2010) (noting that the Court can dispense with the bond requirement when there is "no realistic likelihood of harm to the defendant from enjoining his or her conduct. Furthermore, [a] bond may not be required . . . when the movant has demonstrated a likelihood of success") (internal citations omitted).

### III.  Conclusion

*Buckley*'s distinction between contributions and expenditures appears tenuous. *McCutcheon* at 1464 ("today's decision, although purporting not to overrule *Buckley*, continues to chip away at its footings") (Thomas, J., concurring).  As Justice Thomas wrote, "what remains of *Buckley* is a rule without a rationale.  Contributions and expenditures are simply 'two sides of the same First Amendment coin,' and our efforts to distinguish the two have produced mere 'word games' rather than any cognizable principle of constitutional law."  *Id.*  Even under what remains of *Buckley*, the defendants' legal theory cannot pass constitutional muster.  The plaintiffs have been shut out of the political process merely by association with conservative politicians. This cannot square with the First Amendment and what it was meant to protect.

**\*\*\***

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** the plaintiffs' motion to preliminarily enjoin Defendants Chisholm, Landgraf, Robles, Nickel and Schmitz from continuing to conduct the John

Doe investigation is **GRANTED**. The Defendants must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the investigation. Plaintiffs and others are hereby relieved of any and every duty under Wisconsin law to cooperate further with Defendants' investigation. Any attempt to obtain compliance by any Defendant or John Doe Judge Gregory Peterson is grounds for a contempt finding by this Court.

Dated at Milwaukee, Wisconsin, this 6th day of May, 2014.

BY THE COURT:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**